IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 2, 2010

**STATE OF TENNESSEE v. EDWARD L. HOOD, JR.**

**Direct Appeal from the Circuit Court for Henderson County**
**No. 08059-3     Roger A. Page, Judge**

_____

**No. W2009-02501-CCA-R3-CD  - Filed December 6, 2010**

_____

The Defendant-Appellant, Edward L. Hood, Jr., was convicted by a Henderson County Circuit Court jury of two counts of rape of a child, a Class A felony, and two counts of incest, a Class C felony.  He received consecutive sentences of twenty-three years and twenty-five years for the rape of a child convictions, and concurrent five-year sentences for each of the incest convictions, for an effective sentence of forty-eight years in the Tennessee Department of Correction.  On appeal, Hood argues:  (1) the evidence was insufficient to support his convictions; (2) his right to a fair trial was violated when trial counsel announced that Hood was pleading guilty at the start of trial; (3) the trial court erred in preventing the victim's sister from testifying for the defense at trial; and (4) the trial court erred by failing to grant a new trial on the basis of newly discovered evidence.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Bradley Glenn Kirk (at trial), Lexington, Tennessee; Jerry M. (Mike) Mosier (on appeal), Jackson, Tennessee, for the Defendant-Appellant, Edward L. Hood, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Angela R. Scott, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Trial.**  C.L., the victim in this case, testified that she was eleven years old when the first crime in this case occurred.  She stated that on February 24, 2007, her father, Hood,

entered her room and took off his clothes. He then walked over to her bed, took her pajamas off, got on top of her, and penetrated her vagina with his penis. Before leaving her room, Hood told the victim, "If you say anything[,] I'm going to hurt you." The victim stated that she remembered the crime occurring on February 24 because it was close to her mother's birthday on February 23.

On July 28, 2007, the victim stated that her father had sexual intercourse with her in the same manner as on February 24, 2007. She remembered the date that this second crime occurred because it was close to her birthday on July 20. She said she later told her mother about these crimes, but she and her mother did not immediately report these crimes to the police. The victim said that she and her mother reported the crimes to the police some time in December when her father was no longer living with them. The victim said that she did not immediately tell her mother about the February 24, 2007 crime because she was scared. She could not explain why she and her mother did not contact the police regarding the crimes sooner. On cross-examination, the victim denied allowing boys into her room through her window.

Landon Delaney testified that he was a correctional officer at the Henderson County Jail in 2007. On December 26, 2007, during a random search of Hood's cell, Delaney found a note written by Hood, which stated, "I, Ed Hood, fingered and [f-----] my youngest child, [the victim], and said some sex-related things to [the victim's] friend, [K.B.]. She and [the victim] were talking about sex and having a threesome. I said I wanted to see that. Signed, Ed Hood." Delaney said that he removed the note from Hood's cell and gave it to the jail sergeant, Lelani Murphy. Although Hood never reported a fight while he was in jail, Delaney remembered Hood having a black eye at some point during his incarceration. He said Hood never disclosed who had given him the black eye and never wanted to answer any questions about it. Delaney stated that it was unusual for inmates to write confessions and that Hood's note was the only confession that he had ever found at the jail.

Justin Wallace, an investigator with the Henderson County Sheriff's Department, testified that Hood asked to speak with him on December 26, 2007, regarding the note that was found in his cell. Investigator Wallace gave Hood his Miranda rights, Hood signed a written waiver of these rights, and then Hood gave the following statement:

> I, Ed Hood, did advise Investigator Wallace that there was a possibility that while I was messed up on pills that I could have had sexual relations with my daughter, [the victim]. I also advised him that while my daughter was on the phone with [K.B.] I overheard them talking about having a threesome. I advised [K.B.] that I would like to see that when she was eighteen.

Donna Heatherington, a lieutenant with the Lexington Police Department, testified that the victim and the victim's mother initially reported the crimes to her in December 2007. She then set up a forensic interview for the victim at the Carl Perkins Center. Although she attempted to talk to Hood about these crimes, he refused to talk to her. She said that she did not interview the victim's sister, K.P., because she was not living in the home at the time that these crimes occurred. Lieutenant Heatherington stated that a rape kit was not conducted on the victim because so much time had passed since the crimes were committed. Following Lt. Heatherington's testimony, the State rested.

The defense recalled the victim to the stand. During questioning by defense counsel, the victim acknowledged telling a forensic interviewer that her father had never sexually abused her. The victim said she told the interviewer that her father was innocent because she did want her father to get into trouble and because she was afraid of her father. She admitted that she made this statement regarding her father's innocence after her father was arrested.

Robin Reddick, the victim's aunt and Hood's sister, stated that the victim had lived with her for approximately a month and a half. Reddick stated that she did not find the victim to be an honest, truthful child.

Victoria Westerfield, the victim's cousin, testified that the victim told her at a Christmas party that "she lied about her daddy's case and misse[d] her daddy." Westerfield said that there were no adults present when the victim made this statement to her.

Lelani Murphy, the jail administrator, testified that incident reports are generated when a prisoner receives a black eye while incarcerated. She said that she did not recall Hood having a big black eye but did remember him having a "little bit of a little thing right here[.]" She stated that the jail records did not contain any incident reports regarding Hood. Murphy said that there are always two jailers present and that these jailers would be able to hear an altercation or see an altercation on the cameras, which are set up to monitor the jail cells.

Brenda Riley, Hood's mother and the victim's grandmother, testified that Hood's face was red, he appeared as though he were in pain, and he looked as if someone had "been hitting him in the face" at his court appearance in early January 2008. Riley opined that the victim was not a truthful child.

Hood denied committing the crimes in this case. He stated that the victim was a "daddy's girl" when she was younger; however, he stated that not too long ago he had called the police because C.L had become "unruly." He said that he sometimes had problems getting the victim to behave properly.

Hood stated that he was assaulted by other inmates while he was incarcerated. He also stated that the inmates in his cell forced him to write the note that was discovered during the random search of his cell. He said that these inmates gave him two black eyes, cracked his ribs, and "busted" his head and lip. Hood said that he reported his injuries to a jail officer and to the jail nurse.

Hood stated that he did not recall asking to speak to Investigator Wallace. He said that he did not know the names of any of the investigators other than Investigator Heatherington, who investigated his case. He stated that he wrote the note because he "was already getting beat up on a daily basis" after the other inmates discovered his charges. He said that these inmates forced him to use the specific words in the note.

On cross-examination, Hood said that he was surprised to discover that the victim had no disciplinary problems at school. He also acknowledged that the victim's grades had improved since she no longer lived with him. Hood claimed that he yelled for help and banged on the doors during the inmate assaults, but the jailers in the front never heard him. Hood said that Officer Meggon was the only jailer that he told about what was happening to him, but he never told her the names of the individuals who were injuring him. He also told his family about the assaults. Hood said that although the inmates in his cell threatened to sexually assault him, they never actually sexually assaulted him.

Shannon Hood, the victim's mother, testified that she gave a statement to Lieutenant Heatherington regarding the crimes Hood committed against her daughter. She stated that Hood had become slightly more strict with the victim just before the victim made the sexual abuse allegations against him. During cross-examination by the State, Ms. Hood admitted that she was aware that Hood was committing these crimes against their daughter but did not tell the police immediately. However, Ms. Hood said that she told Lieutenant Heatherington that she failed to contact the police immediately regarding Hood's crimes. She said that her failure to immediately contact the police about these crimes was one of the main reasons that the victim was currently living with a foster family instead of with her. Ms. Hood said that she knew Hood was committing these crimes because she "heard moaning" when Hood would go into the victim's room. She said that Hood would stay in the victim's room for thirty minutes to an hour. She claimed that she did not contact the police because she "was scared."

## ANALYSIS

**I. Sufficiency of the Evidence.** Hood argues that the evidence in this case was insufficient to support his convictions because it lacked credibility. First, Hood argues that although the victim testified that he committed these offenses against her, she also admitting

-4-

telling counselors at the Carl Perkins Abuse Center that he never sexually abused her. In addition, he asserts that the evidence admitted at trial showed that the victim told other individuals that Hood was innocent. Second, he argues that there was no "independent forensic evidence" obtained in this case and no "medical examination of the alleged victim" to determine whether she had ever had sexual intercourse. Third, he contends that his written statement admitting guilt was untrustworthy because the evidence at trial showed that he was assaulted by other inmates and forced to write the statement under duress. In response, the State contends that it was the jury's prerogative to make these credibility determinations regarding the witnesses, that the evidence was legally sufficient to support the convictions, and that Hood is not entitled to relief. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Matthews, 805 S.W.2d at 779 (citation omitted). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2006). The crime of incest is committed when a person "engages in sexual penetration as defined in § 39-13-501, with a person, knowing the person to be, without regard to legitimacy . . . [t]he person's natural

parent, child, grandparent, grandchild, uncle, aunt, nephew, niece, stepparent, stepchild, adoptive parent, adoptive child[.] T.C.A. § 39-15-302(a)(1) (2006).

Here, the victim testified that Hood raped her on February 24, 2007 and July 28, 2007. Although the victim acknowledged telling a forensic interviewer that her father had never had sexual intercourse with her, she explained at trial that she told the interviewer her father was innocent because she did not want her father to get into trouble and because she was afraid of her father. Hood's wife and the victim's mother, Shannon Hood, testified that she knew Hood was committing these crimes against the victim because she "heard moaning" when Hood would go into the victim's room. Moreover, Hood confessed his guilt in both the handwritten statement found in his cell and in the statement he made to Investigator Wallace on December 26, 2007. Although Hood argued at trial that inmates forced him to write the confession found in his cell, this defense was rejected by the jury. As we previously stated, we will not "re-weigh or re-evaluate the evidence." See Bland, 958 S.W.2d at 659. We conclude that the evidence was sufficient to support the convictions in this case. Accordingly, Hood is not entitled to relief on this issue.

**II. Trial Counsel's Announcement of Guilty.** Hood argues that the trial court erred in failing to declare a mistrial when his attorney mistakenly announced that Hood was pleading guilty to all of the charges in the indictment at the beginning of trial. He contends that this mistake prejudiced him and violated his Sixth Amendment right to counsel. Finally, he asserts that this court should reverse and remand his case for a new trial.

In response, the State contends that Hood has waived this issue for failing to include the transcript from the motion for new trial hearing in the record on appeal. The State also argues that Hood is only entitled to a fair trial, not a perfect trial. It further contends that even if counsel was deficient in making this inadvertent announcement, the error was harmless because the court instructed the jury that statements of counsel were not to be considered as evidence and because there was substantial evidence of Hood's guilt. We agree with the State.

Here, the State read all four counts of the indictment. Then the following exchange occurred between the trial court, the State, and defense counsel:

| The Court: | [Defense counsel], you may enter your client's plea as to each count. |
| [Defense Counsel]: | Your Honor, my client pleads guilty to each count. |

| | |
|---|---|
| [The State]: | You mean – |
| The Court: | You mean – you mean not guilty? |
| [Defense Counsel]: | Not guilty. I'm sorry. |
| The Court: | Okay. All right. Whenever you're ready for your opening statements, go ahead. |

Following the State's opening, the trial court asked that the State and defense counsel approach the bench. The court told counsel that it had never had a situation like this occur. It added, "I don't know whether I should tell the jury you misspoke [sic] and not put any weight on that or just let you tell them when you do your opening." Ultimately, the court, the State, and defense counsel determined that it was best for defense counsel to be the one to say something about the misstatement. During his opening statement, defense counsel explained his inadvertent announcement of guilty following the reading of the indictment by stating, "As you can imagine, situations like this are very nerve-wracking for the lawyer, they're nerve-wracking for everybody. A while ago I entered a plea – I entered a plea of guilty. I meant to say not guilty, so please don't hold that against my client." At the end of trial, the court gave the following instruction to the jury: "Statements, arguments, and remarks of counsel are intended to help you in . . . understanding the evidence and applying the law, but they are not evidence."

We agree with the State that Hood has waived this issue for failing to include the transcript from the motion for new trial hearing in the record on appeal. The appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b); see also Tenn. R. App. P. 27(a)(7) (A brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Moreover, a trial court should declare a mistrial "only upon a showing of manifest necessity." Id. (citing State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003)). Here, defense counsel addressed his mistake during opening statements, and the court instructed the jury that statements of counsel were not evidence. We conclude that this "occurrence fell far short of the standard of 'manifest necessity' for a mistrial to authorize the trial judge to order a mistrial sua sponte." State v. Mabon, 648 S.W.2d 271, 278 (Tenn. Crim. App. 1982) (citing State v. Barton, 626 S.W.2d 296, 298 (Tenn. Crim. App. 1981)). Accordingly, Hood is not entitled to relief on this issue.

**III.  Refeusal to Allow the Defense to Call the Victim's Sister to Testify.**  Hood argues that his right to present witnesses in his own behalf was violated when the trial court refused to allow the victim's sister, K.P., to testify for the defense.  He contends that because there was no voir dire regarding K.P.'s competency, the trial court was unable to make an informed decision regarding this issue.

In response, the State contends that Hood has waived this issue because there was no offer of proof made at trial or at the motion for new trial hearing regarding K.P.'s competency to testify.  Waiver notwithstanding, the State asserts that the exclusion of K.P.'s testimony was harmless in light of the substantial proof of Hood's guilt at trial. We agree with the State.

Following Reddick's testimony at trial, defense counsel stated that it was calling K.P., Hood's other daughter, to testify for the defense.  The State requested a bench conference, expressed its concerns that K.P. was not capable of testifying because she was mentally incompetent, and requested a jury-out hearing prior to her testimony.  When the trial court asked defense counsel about the purpose of K.P.'s testimony during the jury-out hearing, defense counsel stated that K.P. would impeach the victim's testimony that she did not allow boys to sneak into her bedroom through her window.  The State responded:

> Your Honor, I'm going to object to any testimony about boys sneaking in the window.  We had a [Rule] 412 [hearing regarding evidence of a victim's sexual behavior].  I had a discussion about this, about a 412 hearing, and I think we had it three times on there.  There was no indication.  I asked several times if [the defense] intended to introduce any evidence of prior sexual conduct at all.  I was told they were not going to [introduce such evidence].

Defense counsel said he was "not asking anyone about sex."  The State countered that K.P.'s testimony was irrelevant and highly prejudicial.  Then the following exchange occurred:

The Court:  [Defense counsel], as far as sneaking people in and out of the window, there's been no 412 Motion made here.  I suppose you could argue it goes to the credibility of witnesses – the witness and the victim.

But I'm going to find under Rule 403 any probative value [is] substantially outweigh[ed] [by] unfair prejudice, and I'm not going to let you get into it.

|                      |                                                    |
|----------------------|----------------------------------------------------|
|                      | Now, do you have anything else to talk to her about? |
| [Defense counsel]:   | I was going to ask her about her father's conduct with her. |
| [The State]:         | Again, objection. The State objects on relevance, Your Honor. |
| The Court:           | I know that in this case there's been some allegations there was misconduct with [K.P.], also. |
| [The State]:         | Yes, Your Honor. |
| The Court:           | And with all due respect, it's obvious that she may have problems relating what happened. I'm extremely concerned about her saying something in front of the jury that's inadmissible. |
|                      | When you say father's conduct, you mean how he treated her or what? |
| [Defense counsel]:   | Yes, was there any sexual contact between my client – |
| The Court:           | I'm not going to allow that, [Defense counsel]. |
| [Defense counsel]:   | Thank you, Your Honor. |
| The Court:           | Is that all? |
| [Defense counsel]:   | Okay. Thank you. |

Later, during in camera proceedings, the trial court made the following statement on the record regarding its decision not to allow K.P. to testify for the defense:

On [K.P.], I guess I – For the Court of Criminal Appeals I ought to say that I observed [K.P.] and, you know, when she was asked to raise her hand

she could barely do that. And after observing her and looking at what, you know – I guess statements that she – There was some allegation of a prior misconduct of [Hood] with this witness, I as much decided she couldn't testify for the Defense as for the State, so that's just for the record.

We agree with the State that Hood waived this issue when he failed to make an offer of proof. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief to be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also State v. Sims, 45 S.W.3d 1, 15 (Tenn. 2001). The record shows that upon the trial court's exclusion of K.P. as a witness, Hood failed to make an offer of proof regarding K.P.'s competency or the substance of her testimony. Once a trial court rules to exclude evidence, a party may not challenge the exclusion on appeal unless "the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context." Tenn. R. Evid. 103(a)(2). The Tennessee Supreme Court has explained that offers of proof are necessary for appellate review:

> In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit, this is done simply by having the exhibit marked for identification only and not otherwise introduced. <u>When, however, it consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible.</u>

State v. Goad, 707 S.W.2d 846, 852-53 (Tenn. 1986) (emphasis added). Consequently, Hood's failure to make an offer of proof regarding K.P.'s competency and the substance of her testimony results in a waiver of this issue. Waiver notwithstanding, we note that "the competency of a witness is a matter entrusted to the sound discretion of the trial judge, who has the opportunity to observe the witness firsthand." State v. Carroll, 36 S.W.3d 854, 866 (Tenn. Crim. App. 1999). After reviewing the record, we conclude that the trial court did not abuse its discretion in preventing K.P. from testifying for the defense. Accordingly, Hood is not entitled to relief on this issue.

**IV. Newly Discovered Evidence.** Hood argues that the trial court erred in denying his motion for new trial on the basis that the newly discovered evidence was not sufficiently credible. The newly discovered evidence was outlined in an affidavit signed by Brenda Smith, the victim's former foster parent, which was attached to Hood's amended motion for new trial. In the affidavit, Smith asserted that the victim informed her that she had told her cousin that Hood did not commit the offenses for which he was convicted. The affidavit

stated that this information was contrary to the victim's testimony at trial and that Hood had learned of this information after trial. Although Hood admits that his newly discovered evidence was in the nature of impeachment evidence, he contends that the evidence was material because "the testimony, were it heard by a jury, could give said jury a reliable lynchpin upon which to resolve the differences in the credibility of the alleged victim and Victoria Westerfield and afford the Defendant the full and complete hearing to which he is entitled."

In response, the State argues that Hood has waived this issue because he failed to include the transcript from the motion for new trial hearing in the record on appeal. In any event, the State contends that Hood is not entitled to relief on this issue because the trial court determined that Brenda Smith was not credible and because the impeachment evidence was not "so strong and convincing" that it would have resulted in Hood's acquittal. See State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985). We agree with the State.

This issue is waived because of Hood's failure to include the transcript from the motion for new trial hearing in the record on appeal. See Tenn. R. App. P. 24(b); see also Tenn. R. App. P. 27(a)(7). Moreover, Hood has failed to prove that he is entitled to a new trial on the basis of this newly discovered evidence. In order to obtain a new trial on the basis of newly discovered evidence, the defendant must show: "(1) reasonable diligence in seeking the newly discovered evidence; (2) materiality of the evidence; and (3) that the evidence will likely change the result of the trial." State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994) (citing State v. Goswick, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Additionally, "[w]hether the trial court grants or denies a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge." State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing Hawkins v. State, 417 S.W.2d 774, 778 (Tenn. 1967)). Typically, a petitioner will not be granted a new trial where the newly discovered evidence "merely contradicts or attempts to impeach" a witness's testimony at trial. State v. Sheffield, 676 S.W.2d 542, 554 (Tenn. 1984). However, "if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered." State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citing Rogers, 703 S.W.2d at 169; Rosenthal v. State, 292 S.W.2d 1, 4-5 (Tenn. 1956); Evans v. State, 557 S.W.2d 927, 938 (Tenn. Crim. App. 1977)). Here, in the amended order denying the motion for new trial, the court found that "[t]he newly discovered evidence alleged by the defendant to support his Motion for New Trial does not rise to the level of credible evidence which would support a new hearing on this matter." The record shows that Hood was not entitled to a new trial because Smith's testimony was not credible. Therefore, waiver notwithstanding, we conclude that the trial court did not abuse its discretion in denying the motion for new trial based on this newly discovered evidence.

## CONCLUSION

Upon review, we affirm the trial court's judgments.

_____

CAMILLE R. McMULLEN, JUDGE